IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-30045 |
| | ) | |
| CARLOS ALBERTO CHACON-CARRASCO, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant Carlos Alberto Chacon-Carrasco's Motion to Quash Arrest and Suppress Evidence (d/e 13).  The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for a Report and Recommendation.  Text Order, dated August 29, 2006.  After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion be allowed, in part, and denied, in part.  As set forth below, I recommend that the Court suppress certain statements made by the

Defendant in response to custodial interrogation without the benefit of Miranda warnings.  The Motion should be denied in all other respects.

## I.  BACKGROUND[1]

Defendant Chacon-Carrasco is charged with illegal reentry after deportation and possession of counterfeit immigration documents.  The matter came before this Court for evidentiary hearing on the instant Motion on September 14, 2006.  The Government called two witnesses, Illinois State Police Trooper Brian Hayes and Immigration and Customs Enforcement (ICE) Special Agent Stuart Kutz.  The Defense produced no evidence.

Based on the testimony heard in open court, Defendant's vehicle was stopped on May 25, 2006 by Trooper Brian Hayes near milepost 103 on Interstate 55 near Springfield, Illinois.  At that time, Trooper Hayes was on routine traffic patrol duty.  Trooper Hayes testified that, prior to initiating the traffic stop, he was driving his squad car northbound on I-55 in the passing lane.  He observed a green Ford Escort hatchback traveling northbound in the right hand land.  Trooper Hayes noted that the Escort had Texas license plates.  Trooper Hayes remained in the passing lane and drew up

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

to the hatchback.  When the front bumper of Hayes' squad car was slightly behind the hatchback's rear bumper, Hayes observed that the hatchback had a crack on the driver's side of the front windshield.  It is a violation of Illinois law for a person to drive a motor vehicle when the windshield is in such defective condition or repair as to materially impair the driver's view. 625 ILCS 5/12-503(e).  Hayes determined that the hatchback was in violation of this statute and initiated a traffic stop of the vehicle at approximately 3:54 p.m.

Trooper Hayes testified that his squad car is equipped with an in-car video system which automatically begins recording when he activates his oscillating lights.  Trooper Hayes testified that he also is equipped with a microphone that records audio to the in-car video system.  Trooper Hayes must manually activate the microphone before it begins recording.  Trooper Hayes testified that when he received notice of the instant Motion, he went to retrieve a copy of the video/audio tape.  He was informed that the tape had been recycled and erased.  Trooper Hayes testified that it was routine practice for the in-car videos to be maintained for 90 days and then recycled.

The hatchback stopped and Trooper Hayes approached and made contact with the driver, who the trooper identified in court as the Defendant. At all times, Trooper Hayes spoke to the Defendant in English and the Defendant responded to him in English.  Trooper Hayes characterized Defendant's English as "fairly good" and stated that the Defendant appeared to him to understand English.  Trooper Hayes advised Defendant regarding the defective windshield and informed him that he would be receiving a written warning citation.  The trooper asked Defendant to provide a driver's license and proof of insurance, which he did.  The driver's license was issued by the State of Illinois.  Trooper Hayes questioned Defendant regarding his route of travel and also inquired as to the discrepancy between the Illinois driver's license and the Texas vehicle registration.  Defendant explained that he had been in Texas for three months for business and was returning to his residence in Cicero, Illinois.

Trooper Hayes testified that he became suspicious of Defendant based on the discrepancy between the driver's license and registration and his knowledge that I-55 was a major drug route, that Cicero was a high narcotics/high crime suburb of Chicago, and that Texas was a source state for narcotics.  Trooper Hayes returned to his squad car to write the warning

ticket while Defendant remained in the Ford.  Trooper Hayes determined that he was going to ask for consent to search the hatchback, so he radioed for back-up.  Trooper Hayes testified that, for officer safety, he requests a back-up officer to watch a driver while he is searching a vehicle. Trooper Hayes also conducted a computer inquiry on Defendant's driver's license which showed that the license was valid.  Trooper Hayes completed the warning citation, and Illinois State Police Lieutenant Buckley arrived on the scene as back-up.

Trooper Hayes went back to the Ford and asked Defendant to exit. The two men went over into the grass where Trooper Hayes explained the warning citation to Defendant.  Trooper Hayes then issued Defendant the warning citation for the cracked windshield.  See Government Ex. 1. Defendant signed the warning citation.  Trooper Hayes estimated that approximately 20 minutes had passed since the initiation of the traffic stop. On cross-examination, Trooper Hayes testified that Defendant was not free to leave during this 20 minute time period.

Trooper Hayes testified that Defendant was free to leave after the citation was issued, but stated on cross-examination that he did not recall telling the Defendant that he was free to leave.  After the citation was

issued, Trooper Hayes asked Defendant whether he was carrying any weapons, drugs, open alcohol, or anything illegal in the car.  Defendant said no and stated that the trooper could search the vehicle.  Trooper Hayes inquired whether Defendant was giving him consent to search the vehicle.  Defendant responded that he was.  The trooper then asked Defendant whether he had anything illegal on his person.  Defendant responded that he did not.  Defendant consented to a search of his person. Trooper Hayes searched Defendant's person.  The search uncovered no contraband.  Trooper Hayes then placed Defendant in the front passenger seat of the squad car for safety reasons.

Trooper Hayes began to search Defendant's vehicle with Trooper Strubbe who had arrived on the scene.  Trooper Hayes searched the vehicle from front to back.  In the rear hatchback area, he noticed an area over the wheel wells that did not appear to serve any purpose.  Trooper Hayes removed a cover to the area on the driver's side and shined his flashlight down into the area.  He did not see anything.  Trooper Hayes then went through the same procedure on the passenger side.  When he shined his flashlight down into the area above the rear passenger side wheel well he saw some newspaper that was neatly folded and about the

size of a wallet.  Trooper Hayes removed the newspaper and unfolded it.

Inside, he discovered a small manilla envelope approximately the size of a

credit card.  Trooper Hayes opened the envelope and discovered several

driver's licenses, several social security cards, a photo copy of a driver's

license and social security card, and a resident alien card with Defendant's

picture, but a different name and date of birth than the driver's license that

the Defendant had provided.  At this point, Trooper Hayes concluded his

search.  Trooper Hayes estimated that it took approximately 20 minutes for

him to conduct the search.  Trooper Hayes testified that once he

discovered the documents, Defendant was no longer free to leave but

rather was being "detained."

Trooper Hayes took the documents he had discovered back to the

Defendant and asked him about them.  Defendant responded that he knew

that the documents were there, but that they had been there when he

purchased the car and he had merely left them in it.  The trooper showed

Defendant the resident alien card with what he believed to be Defendant's

picture on it.  Defendant denied that the photograph was of him.

Trooper Hayes then contacted the Statewide Terrorism and

Intelligence Center (STIC) to inquire into the information about the

Defendant.  Trooper Hayes testified that STIC had more information than he had access to on his computer or through dispatch.  Trooper Hayes was informed by STIC that Defendant had overstayed his visa and was wanted for deportation.  By this time, approximately four troopers other than Hayes were on the scene including a canine officer.  Trooper Hayes does not recall whether the canine officer used his dog to conduct a sniff of Defendant's vehicle.  Trooper Hayes held Defendant for ICE agents to arrive.

Trooper Hayes testified that he never threatened Defendant or told him that he had to talk or that he was not free to leave.  Trooper Hayes further stated that Defendant never asked him to stop searching, or restricted the scope of his consent in any way.

Agent Kutz testified that ICE was informed of the incident at approximately 4:55 p.m.   Kutz and ICE Agent Merchant dispatched to the scene from their office on the southwest side of Springfield, Illinois.  The ICE agents arrived on the scene at approximately 5:20 p.m. and spoke to Trooper Hayes, who handed Kutz the documents he had discovered.  Kutz then asked Defendant to exit the squad car.  Kutz asked Defendant what his immigration status was.  Defendant informed him that he was a "B2"

and had entered the United States in 2002. Kutz knew that a B2 was a six-month visa and thus, he determined that Defendant had overstayed his visa and was out of status. Kutz spoke to Defendant primarily in Spanish, but occasionally used English. Defendant spoke to the ICE agents in both Spanish and English.

Agent Kutz placed Defendant under arrest and placed him in the ICE sedan. Agent Kutz testified that he and Agent Merchant were on the scene for approximately 20 minutes. The agents booked Defendant into the Sangamon County jail overnight and then returned at 9:00 a.m. the next morning in an attempt to interview Defendant. Defendant was presented with a Miranda waiver in Spanish. He informed the agents that he wished to speak to an attorney.

Agent Kutz testified that he had another encounter with Defendant when he transported Defendant to this Court for his initial appearance. Agent Kutz testified that, while he was being transported, Defendant made the unsolicited statement, in English, that he knew he had come to the country illegally, but asked the agents not to send him to jail.

At the conclusion of the evidentiary hearing, the Court took judicial notice of the fact that the traffic stop at issue occurred on May 25, 2006

and that ninety days from that date is approximately August 25, 2006.  The

Court further noted that the instant Motion was filed August 25, 2006.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

Defendant seeks to quash his arrest and to suppress the physical

evidence seized from his vehicle and any statements allegedly made by

him following his arrest.  Specifically, Defendant asserts that the initial

traffic stop was invalid, Trooper Hayes' continued detention and

questioning of Defendant went beyond the permissible scope of the traffic

stop, and he did not give valid consent to the search of his vehicle.  As set

forth below, Defendant's Motion should be allowed, in part, and denied, in

part.

1.  Probable Cause

The Fourth Amendment to the Constitution guarantees the "right of

the people to be secure in their persons, houses, papers and effects,

against unreasonable searches and seizures."  U.S. Const. amend. IV.

Warrantless searches and seizures are "per se unreasonable under the

Fourth Amendment-subject only to a few specifically established and

well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357

(1967).  The Government bears the burden of establishing by a

preponderance of the evidence that an exception to the warrant requirement applies.  United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000).

Based on the evidence presented, it is clear that probable cause existed for the traffic stop in that Trooper Hayes observed a violation of Illinois state law.  Trooper Hayes testified that he observed a crack in the front windshield on the driver's side of the vehicle that Defendant was driving.  Defendant's conduct violated 625 ILCS 5/12-503(e), which provides "No person shall drive a motor vehicle when the windshield, side or rear windows are in such defective condition or repair as to materially impair the driver's view to the front, side or rear."  The decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred.  Whren v. United States, 517 U.S. 806, 810 (1996).  Defense counsel briefly argued that the stop was pretextual; however, as long as the trooper had probable cause to stop the vehicle, his subjective motives are irrelevant.  Id. at 813.

Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense."  United States v. Cashman, 216 F.3d 582, 586

(7th Cir. 2000).  The record in the instant case supports the conclusion that Trooper Hayes had probable cause to believe that a traffic offense had been committed at the time he initiated the traffic stop of Defendant's vehicle, in that the trooper had observed a crack on the driver's side of the vehicle's front windshield.  The initial stop of the vehicle did not violate the Fourth Amendment.

2.  Scope of the Stop

In the alternative, Defendant asserts that the traffic stop became unreasonable under the Fourth Amendment when Trooper Hayes continued to detain and question Defendant once the purpose of the traffic stop was met.  Defendant asserts that once the warning citation was issued Defendant should have been allowed to leave without further delay or additional questioning.  The Seventh Circuit has recognized that a traffic stop is similar to an investigative detention and is therefore governed by the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968).  See United States v. Finke, 85 F.3d 1275, 1278 (7th Cir. 1996).  The stop must be justified at its inception, which, as set forth above, the stop at issue in the present case clearly was.  However, in addition, the stop must be reasonably related in scope to the circumstances which justified the

interference in the first place.  Id. at 1279.  "The detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  Id. (internal quotations and citations omitted).

Consensual encounters between citizens and law enforcement officials, do not trigger Fourth Amendment protections.  United States v. Moore, 375 F.3d 580, 584 (7th Cir. 2004).  The Supreme Court has recognized the possibility of consensual encounter following the completion of traffic stop in holding that an officer is not required to inform a driver that he is free to go before a consent to search may be deemed voluntary. Ohio v. Robinette, 519 U.S. 33, 35 (1996).

Defendant relies upon People v. Ruffin, 734 N.E.2d 507 (Ill. App. 3d Dist. 2000), in arguing that Defendant's continued detention violated the Fourth Amendment.  The relevant facts of Ruffin are as follows.  Law enforcement officials stopped the vehicle that Ruffin was driving after an officer observed Ruffin driving 4 miles over the posted speed limit.  Id. at 509.  Twenty-two minutes after the initial stop, at 8:19:20 p.m., the officer presented Ruffin with traffic citations.  Id. at 510.   The officer told Ruffin that he was free to go and said, "Have a safe trip."  Id.  However, at the hearing on Ruffin's motion to suppress, the officer indicated that he did not

believe that Ruffin was truly free to go at this time.  Id.  In fact, the officer intended to detain Ruffin to effect a search of his car, either by consent or with the assistance of the canine unit.  Id.

At 8:19:34, the officer asked Ruffin if he had anything illegal in his car.  Ruffin, 734 N.E.2d at 510.  Ruffin replied, "No." Id.  The officer asked the for consent to search the vehicle, and Ruffin refused.  After a brief discussion, the officer again asked Ruffin for consent to search the car.  Ruffin again refused to consent.  Id.  The officer then told Ruffin that he would be detaining the vehicle until the canine unit could arrive for a walk-around.  Id.  Ruffin admitted, at 8:20:44, that his fiancée possessed marijuana.  Id.  The officer talked to Ruffin's fiancée and recovered a small bag of what appeared to be cannabis.  Id.  He then informed Ruffin that he was under arrest.  Id.  The officer again asked Ruffin if anything else was in the car, telling Ruffin that he would find out if he lied.  Id.  Ruffin said that there was nothing else in the car.  Id.  The arresting officer removed the keys from the car's ignition and unlocked the trunk where he discovered 285 pounds of cannabis.  Id.

The Ruffin court reversed the decision of the trial court denying Ruffin's motion to suppress the evidence against him.  The appellate court

noted that, while the "business" portion of the stop lasted approximately 10 minutes, Ruffin was detained for more than twice that period of time. Ruffin, 734 N.E.2d at 511.  The appellate court held that Ruffin's detention lasted longer than was reasonably necessary to effectuate its purpose and became "a subterfuge in order to obtain other evidence."  Id.  Thus, the appellate court determined that the search and seizure in question were unreasonable under the Fourth Amendment.  Id.

The present case is distinguishable from Ruffin, for several reasons, one of which is the fact that the record evidence shows that, after the warning citation was issued, Defendant was no longer being detained, but was free to leave.  In Ruffin, once the tickets were issued Ruffin twice refused consent at which point the officer told Ruffin that he would be detaining the vehicle until the canine unit could arrive.  In the instant case, the trooper issued the warning citations and then asked one question, i.e., whether the  Defendant had anything illegal in his vehicle.  Defendant then made the unsolicited offer for the trooper to search his car.

The instant case is strikingly similar to United States v. Rivera, 906 F.2d  319 (7th Cir. 1990).  In Rivera, a police trooper pulled Rivera over to investigate his erratic driving and because a material obstruction was

attached to the car's dashboard.  Id. at  320.  The trooper asked Rivera to wait with him in his squad car while the trooper issued Rivera a warning.  Id.  The trooper said "that was it" and handed Rivera his warning.  Id.  As Rivera was reaching for the door handle to leave the car, the trooper asked him if he was carrying any drugs or weapons.  Id.  Rivera said no and gave the trooper permission to search the car.  Id.  The trooper subsequently found cocaine under the car's back seat.  Id. at 321.

The district court in Rivera's case found that the initial stop was constitutional because the trooper had probable cause to believe that Rivera had violated Illinois law.  Rivera, 906 F.2d at 322.  Rivera asserted that even if the initial stop was constitutional, the subsequent investigative detention greatly exceeded its legitimate duration and scope.  Id.  The Seventh Circuit held that some of the trooper's questions could be characterized as casual conversation.  Other questions were brought on by the trooper's reasonable suspicions, which were aroused by the inconsistent answers given by Rivera and his passenger and the smell of alcohol permeating Rivera's car.  Id. at 322.  The Court held that none of the questions were egregious enough to make the scope of the trooper's investigation unconstitutional.  Id.  The Court further stated that, at the time

Rivera was given his written warning, his identification was returned, and
he was given a cue to leave, the stop and the investigation relating to the
traffic offense was complete.  Id. at 323.  According to the Seventh Circuit,
"[a]fter that point, the encounter between the trooper and Rivera was
consensual."  Id.

Similarly, in the present case, Trooper Hayes' unrebutted testimony
revealed that, after the warning citation was issued, Defendant was no
longer being detained, but was free to leave.  At that point, the stop and
investigation relating to the traffic violation was completed.  The encounter
between the trooper and the Defendant that occurred next was consensual
and thus fell outside the scope of Fourth Amendment protections.  Trooper
Hayes was not required to inform Defendant that he was free to go.
Defendant's claim that he was  unlawfully detained after the purpose of the
traffic stop was met is not supported by the evidence.

3.  Consent

The Fourth Amendment's prohibition against warrantless searches
does not apply when law enforcement officials receive voluntary consent to
search.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United
States v. Grap, 403 F.3d 439, 442 (7th Cir. 2005).  In Schneckloth, the

Supreme Court stated that the question whether a consent to search was in fact voluntary is to be determined from the totality of the circumstances. Id. at 227.  The Government bears the burden of proving by a preponderance of the evidence that the consent was voluntary.  United States v. Sandoval-Vasquez, 435 F.3d 739, 744 (7th Cir. 2006).  Whether consent is voluntary is a question of fact.  Schneckloth, 412 U.S. at 227. Factors that a court must consider in analyzing whether consent was voluntary include:

> (1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent.

Sandoval-Vasquez, 435 F.3d at 744.

Defendant's Motion asserts that no consent was given for the search of his vehicle.  However, after applying the relevant analysis to the evidence presented, the Court believes that the Government has shown by clear and convincing evidence that Defendant voluntarily consented to the search of his entire vehicle.  Trooper Hayes testified that Defendant made the unsolicited offer for the trooper to search his vehicle after the trooper

asked him if he had anything illegal in it.  The trooper then confirmed

Defendant's consent with a clear follow-up question regarding consent.

Trooper Hayes stated that Defendant never withdrew or limited his consent

in any way.  No evidence was presented to contradict the trooper's

testimony on this point, and the Court finds Trooper Hayes to be a credible

witness.

The Court recognizes that the exchange between Trooper Hayes and

the Defendant was conducted solely in English, which is not Defendant's

native language.  However, the evidence presented supports the

conclusion that Defendant was fairly proficient with spoken English and that

he understood the trooper's request.  Moreover, while Defendant was not

advised of his right to refuse consent, that is only one factor for the Court's

consideration.  See Schneckloth, 412 U.S. at 227.  The Court further notes

that there was no evidence of physical coercion.

Trooper Hayes estimated that twenty minutes had passed from the

time the traffic stop was initiated until Defendant granted consent to search.

This is not an unreasonable amount of time.  Furthermore, as the Court

has previously noted in subsection 2, Defendant was not in custody at the

time he gave his consent, rather the consent was given during a

consensual encounter that followed the conclusion of Defendant's

detention on the traffic violation.  Thus, the record as a whole supports a

finding that Defendant voluntarily consented to the search of his entire

vehicle.  There is no reason to suppress the evidence that was found

during the search, or any fruit thereof.

4.  Defendant's statements

The Fifth Amendment protects an individual from being "compelled in

any criminal case to be a witness against himself."  U.S. Const. amend. V.

In Miranda v. Arizona, the Supreme Court recognized that "in-custody

interrogation" places "inherently compelling pressures" on persons

interrogated.  Miranda, 384 U.S. 436, 467 (1966).  Thus, to safeguard the

Fifth Amendment privilege against self-incrimination, under Miranda, the

prosecution may not use statements, whether exculpatory or inculpatory,

stemming from custodial interrogation of a defendant unless it

demonstrates the use of procedural safeguards effective to secure the

privilege against self-incrimination.  Id. at 444.  The Supreme Court has

defined custodial interrogation as "questioning initiated by law enforcement

officers after a person has been taken into custody or otherwise deprived of

his freedom of action in any significant way."  Id.

Trooper Hayes testified that after he found the documents in the hatchback, he "detained" Defendant until the ICE agents arrived.  While Trooper Hayes concedes that Defendant was not free to leave from this point forward, there is no evidence that Defendant was advised of his <u>Miranda</u> rights before he was subjected to interrogation by both Trooper Hayes and Agent Kutz.  The fact that Trooper Hayes never informed Defendant that he was "under arrest" is irrelevant; it is clear from the evidence presented that  after Trooper Hayes found the documents, Defendant's freedom of action was restricted.  Thus, in order for the statements by Defendant that stemmed from his custodial interrogation to be admissible the Government must demonstrate the use of the requisite procedural safeguards.  It has failed to do so.

After Trooper Hayes discovered the documents, he questioned Defendant about them, Defendant responded that he knew that the documents were there, but that they had been there when he purchased the car and he had merely left them in it.  The trooper questioned Defendant regarding the resident alien card with what he believed to be Defendant's picture on it.  Defendant denied that the photograph was of him.  Agent Kutz testified that, when he arrived on the scene, he asked

Defendant what his immigration status was.  Defendant informed him that

he was a "B2" and had entered the United States in 2002.  There is no

evidence that Defendant was informed of his Miranda rights before these

exchanges.

At the evidentiary hearing, the Court inquired as to the admissibility of

the statements to Trooper Hayes and Agent Kutz described above.

Counsel for the Government conceded that there may be some question as

to whether certain statements that Defendant made before Miranda would

be admissible at trial.  Although Defendant did not identify specific

statements that he sought to have excluded, his motion asks the Court to

suppress statements he made including "any and all conversations taking

place between the Defendant and the arresting officer."  Motion to Quash,

p. 3.  The Court believes that the statements set forth above fall within the

scope of Defendant's motion.  Because there is no evidence that

Defendant was advised of his Miranda rights before he was questioned, the

statements made in response to questioning by Trooper Hayes and Agent

Kutz described above should be suppressed.

III. CONCLUSION

For all the above reasons, I recommend that Defendant's Motion to Quash Arrest and Suppress Evidence (d/e 13) be ALLOWED, in part, and DENIED, in part.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after being served with a copy of this Report and Recommendation.  See 28 U.S.C. § 636(b)(1).   Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986); Local Rule 72.2.

ENTER:  September 18, 2006

s/ Byron G. Cudmore

_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE